Raymond DURAND a/k/a Raymond
Durand Holbin, Appellant,

v.

The STATE of Texas, Appellee.

No. 01–92–01123–CR.

Court of Appeals of Texas,
Houston (1st Dist.).

Aug. 11, 1994.

**570**

Ken J. McLean, Houston, for appellant.

John B. Holmes, Jr., Dist. Atty., J. Harvey Hudson, Ted Wilson, Bill Taylor, Asst. Dist. Attys., for appellee.

Before HEDGES, DUGGAN and ANDELL, JJ.

## OPINION

HEDGES, Justice.

A jury convicted appellant of the murder of his wife, Jeannine Paulette Boissoneault Durand, and assessed his punishment at 30 years in prison. In nine points of error, appellant attacks the sufficiency of the evidence supporting his conviction, assigns error to various trial rulings, and contends that the trial court abused its discretion in denying his motion for new trial. We affirm.

On February 11, 1968, a man and his young son discovered a human body in a wooded area near the intersection of Barker–Clodine and Westheimer. When sheriff's deputy Johnny Klevenhagen first saw the body, it was wrapped in a bed cover and bound with a rope. Klevenhagen investigated and took identification photographs, and Dr. Robert Bucklin, of the Harris County medical examiner's office, performed an autopsy on the body. Dr. Bucklin found injuries tending to indicate that the decedent had died neither naturally nor by accident, but

had been killed by someone.[1] The sheriff's office was unable to match the body with any missing person report, and no suspects were identified. Thereafter, the case—known by its file number, 68–500—remained open but inactive.

Anne–Marie Durand Hallberg and Denis Durand are the children of Jeannine Durand and appellant Raymond Durand. At the end of 1967 and beginning of 1968, when they could last recall seeing their mother, they were approximately nine and 12 years old. In 1990, after years of uncertainty about what had happened to their mother, they undertook to establish the truth. While she was a prosecution witness in California, Anne–Marie had become acquainted with Joseph Jean Nadeau, an investigator with the Riverside district attorney's office. Nadeau agreed to help Anne–Marie and Denis, and with his assistance, they ultimately came upon file number 68–500 in Harris County, Texas. Denis contacted Michel Beland, Jeannine's cousin, who arranged to have the Harris County medical examiner's office send him the photographs from that file. Beland identified the body shown in the photographs as that of Jeannine. Appellant was arrested and prosecuted for the murder of Jeannine Durand.

■ In point of error one, appellant contends that the jury's implicit finding that the body described in file number 68–500 ("the body") was that of Jeannine was against the great weight and preponderance of the evidence. In so contending, he asks this Court to conduct a review of the factual sufficiency of the evidence on a matter that the State must prove. Appellant urges that the factual sufficiency standard of review is appropriate in certain cases in which the physical evidence dramatically contradicts the jury verdict in a way that cannot be resolved by either mere deference to the jury's assessment of credibility or resort to inferences.

■ On previous considerations in which we have been asked to conduct a factual review of a criminal verdict, we have limited such a review to matters on which the defendant has the burden of proof. *See Moody v. State,* 830 S.W.2d 698, 704 (Tex.App.—Houston [1st Dist.] 1992, pet. ref'd). At least one Texas appellate court has recently enlarged the scope of the factual sufficiency standard. In *Stone v. State,* 823 S.W.2d 375, 377 (Tex. App.—Austin 1992, pet. ref'd, untimely filed), the Austin Court of Appeals reviewed the factual sufficiency of the evidence supporting Stone's conviction using the standard of review set forth in *Meraz v. State,* 785 S.W.2d 146 (Tex.Crim.App.1990), thereby extending factual sufficiency review to matters on which the State had the burden of proof.

We disagree with *Stone's* application beyond those matters on which the defendant has the burden of proof. The *Meraz* standard applies only to review of the evidence supporting defensive issues on which the defendant has the burden of proof by a preponderance of the evidence. *Jones v. State,* 817 S.W.2d 854, 855 (Tex.App.—Houston [1st Dist.] 1991, no pet.). Since the *Stone* decision, we have declined the same extension of *Meraz* no fewer than three times. *Blackmon v. State,* 830 S.W.2d 711, 713 n. 1 (Tex.App.—Houston [1st Dist.] 1992, pet. ref'd); *Moody v. State,* 830 S.W.2d 698, 704 (Tex.App.—Houston [1st Dist.] 1992, pet. ref'd); *Lopez v. State,* 824 S.W.2d 298, 303–304 (Tex.App.—Houston [1st Dist.] 1992, no pet.). This Court will continue to apply the traditional standard of review in criminal cases, addressing ourselves exclusively to the legal sufficiency of the evidence on matters which the State has to prove. We see no reason to extend the factual sufficiency standard to even the limited category of findings appellant suggests, because those findings can be adequately reviewed under the legal sufficiency standard.

1. Bucklin discovered a skull fracture two inches by one inch, which, he concluded, had been produced by a single blow from a blunt instrument. He also found a fracture of the sternum and fractures of six front ribs and six back ribs—which, he believed, had all been inflicted at the same time as the head injury. As he later testified, the skull fracture and accompanying sub-

dural bleeding had, in his judgment, caused Jeannine's death, and the injuries he observed were not consistent with being run over by a car because they were "not as great as you would expect to have by being run over by a car." He said they might "possibly" be consistent with being thrown out of a car.

We overrule point of error one.

In point of error two, appellant argues that no rational trier of fact could have found that the body was Jeannine's. In conducting a legal sufficiency review, we consider the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found all the elements of the offense beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 320, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). This standard of review applies to both direct and circumstantial evidence. *Green v. State,* 840 S.W.2d 394, 401 (Tex. Crim.App.1992), *cert. denied,* — U.S. —, 113 S.Ct. 1819, 123 L.Ed.2d 449 (1993); *Palmer v. State,* 857 S.W.2d 898, 899 (Tex. App.—Houston [1st Dist.] 1993, no writ). We may not act as a thirteenth juror in assessing the evidence. *Moreno v. State,* 755 S.W.2d 866, 867 (Tex.Crim.App.1988). If there is evidence that establishes guilt, beyond a reasonable doubt, and if the trier of fact believes that evidence, we may not reverse the judgment on sufficiency of the evidence grounds. *Id.*

In the light most favorable to the verdict, the evidence shows the following: The State introduced a black-and-white photograph of the face and upper torso of the body taken shortly after the body was found on February 11, 1968 (State's Exhibit 1) as well as a photograph of Jeannine taken at the family residence. Beland identified the body shown in State's Exhibit 1 as that of Jeannine—as did Denis, Anne–Marie, Jeannine's brother Reginald Boissoneault, and appellant's uncle, Robert Durand.

Appellant argues that the jury's finding that the body in question was that of Jeannine Durand was contrary to "credible and practically undisputed" evidence concerning her physical characteristics. This argument is unavailing. The jury, as the trier of fact, is the sole judge of the credibility of witnesses, and may believe or disbelieve all or any part of any witness's testimony. *Sharp v. State,* 707 S.W.2d 611, 614 (Tex.Crim.App. 1986), *cert. denied,* 488 U.S. 872, 109 S.Ct. 190, 102 L.Ed.2d 159 (1988).

Appellant also argues that the face shown in State's exhibit 1 is notably distorted, decomposing, and bloated. The identification testimony here should be scrutinized in the same light as that of a witness whose vision was clearly obstructed but who nevertheless claims to have viewed an event. [Here,] [t]he galactic improbability that the body in State's exhibit 1 is that of Jeannine Durand is clear.

We agree with appellant's first premise: the face shown in the photograph is notably distorted. We do not, however, agree that the identification testimony is like that of a witness whose vision was obstructed, because the opportunity for the witnesses to perceive the face shown in State's exhibit 1 clearly existed. The image in the photograph is recognizable as the face of an adult female human, despite the distortion wrought by death and its aftermath. The distortion created by post-mortem deterioration amounted to nothing more than a proper basis for impeaching the witnesses who identified Jeannine. It was not so extreme as to remove the matter from the province of the jury, who could rationally conclude that, upon examining both photographs, the witnesses were honestly able to recognize Jeannine Durand as the person depicted in both photographs.

Appellant further contends that no rational jury could have believed that the body was Jeannine's because of the following conflicts in the evidence:

(1) Whether the body had undergone a tubal ligation;

(2) Whether Jeannine's eyes and the body's eyes were the same color;

(3) Whether Jeannine's hair and the body's hair were the same color;

(4) Whether Jeannine and the body were the same height; and

(5) Whether Jeannine wore contact lenses (no contact lenses were found on the body).

### Tubal Ligation

Appellant argues that the evidence shows that Jeannine underwent a tubal ligation but that no such procedure had been performed on the body. Jeannine's medical records reflect that she had a tubal ligation following

the birth of her youngest child. The surgeon entered the abdomen through a subumbilical incision and removed a small segment of both the right and left Fallopian tubes.

Dr. Bucklin, the physician who conducted the autopsy on the body, reported a 3″ well-healed incision under the navel. The body's ovaries and oviducts were normal. Dr. Bucklin had never performed a tubal ligation. Dr. Marcontell, a gynecologist with extensive experience in tubal ligation, testified that the effects of a ligation would not be obliterated over time, suggesting that Dr. Bucklin would have been able to see or feel results of the operation. Dr. Jachimczyk, the Harris County Medical Examiner, testified that it is normal procedure to sew the cut ends of a Fallopian tube together to prevent infection. Furthermore, after the healing process is completed and the sutures have been dissolved, there are few visible signs of surgery, particularly in a decomposing body.

### Eye Color

Appellant contends that the evidence shows that Jeannine's eye color and that of the body were irreconcilably different. Jeannine's brother testified that Jeannine's eyes were blue. Dr. Bucklin observed during the autopsy that the body's eyes appeared to be brown.

Dr. Bucklin qualified his observation with the caveat that the body had been exposed to the elements for 10 days, in his estimation, and that it was moderately decomposed. He testified that decomposition "makes looking for eye color, for example, somewhat hazardous because the postmortem change may alter the hue of the eye." Although the decomposition of this body was not so advanced that the color of the eyes was altered, he could not say what color the body's eyes had been before death. Dr. Jachimczyk testified that although eye color does not change at the moment of death, the decomposition of the body can and does change it. He described a dark pigment that forms when the hemoglobin in the eye breaks down in the process of decomposition.

### Hair Color

Appellant contends that the evidence demonstrates an irreconcilable conflict about hair

color. Various witnesses described Jeannine's hair as "blond," "brownish blond," and "light brown." In the autopsy report, the body's hair was described as "dark brown." While acknowledging that hair does not actually change color after death, contaminants formed during decomposition can alter its appearance:

> As far as the color [of hair] is concerned, that does not change, but the appearance of that does. It also looks much darker and for all intents and purposes light hair looks dark. If you take the same hair, though, and wash it and dry it, then it will show its true color, but to the eye in a decomposing body at the autopsy prior to any washing the light hair will look dark.

### Height

Appellant asserts that the evidence embodies an irreconcilable conflict about height. One item on a pre-operative check sheet in Jeannine's medical records reads as follows:

|  | 181# |
| --- | --- |
| Other Prosthesis None | 5′3″ |

The State argues that the meaning of this notation is unclear, because 181# and 5′3″ are not logically related to a prosthesis. Appellant contends that this notation signifies that Jeannine weighed 181 pounds and was 5′3″ tall. In the autopsy report, the body's height is listed as 5′7″. Jeannine's brother testified that she was 5′7″ tall, and Patricia Holben, who is 5′3″ tall, testified that Jeannine was taller than she. Dr. Jachimczyk testified that bloating during decomposition sometimes distorts body measurements, and often pathologists will "take a tape measure and measure a body from head to heel and go over the mountain, down the valley and over the abdomen."

### Contact Lenses

Lastly, appellant points to Jeannine's habit of wearing contact lenses and the absence of lenses on the body. A rational jury would know from its common experience that contact lenses are easily removed for a number of reasons.

We are not persuaded that no rational jury could resolve the conflicts in the evidence in favor of the finding that the body was Jean-

nine's. Evaluated in the light most favorable to the verdict, the evidence is legally sufficient to establish that the body was Jeannine's.

We overrule point of error two.

■ In point of error four, appellant attacks the legal sufficiency of the evidence to support the jury verdict that he caused Jeannine's death.

In the light most favorable to the verdict, the evidence shows the following:

In 1954, appellant and Jeannine Paulette Boissoneault were married in Hull, Quebec, Canada. They made their home in Hull, where appellant was employed as a repairman in the body shop of an auto dealership. Their first son, Denis, was born on December 30, 1955, and their first daughter, Anne–Marie, was born on January 19, 1959; three years later, they had another son, Mark.

Pat Holben was a telephone switchboard operator at the dealership where appellant worked. According to her testimony, she and appellant became involved in an adulterous relationship sometime in 1966. After about six months, appellant told his wife and family that he was leaving to find a better job in the United States. Jeannine and the children remained behind while, unknown to them, Holben accompanied appellant on a drive that took them to Fort Lauderdale, Florida. They both found work, rented a house, and began living together. Soon afterward, appellant told Holben that he had a wife and kids living in Canada, and that he was going to bring them to Florida. He did so, renting a second house for them. A few days after their arrival, appellant introduced Jeannine and the kids to Holben. He falsely claimed that Holben was his employer's wife, and he instructed his children to address her as "Aunt Pat."

In mid–1967, after the birth of their fourth child, Martine, appellant sent Jeannine and the kids back to Canada, ostensibly because the kids needed French language instruction not available in Florida schools. He resumed his cohabitation with Holben, and the two of them moved to the Houston area. Appellant once again brought his family back down from Canada, moving them into a second residence near the one he and Holben shared. As he had in Florida, he told his wife of Holben's presence, concealing the truth with the aid of a cover story. When he picked up Jeannine at the airport, appellant told her that he had run into Holben and her husband in Louisiana while looking for a French school for the kids. When he discovered that they were on their way to Houston to open a body shop, he had accompanied them and had become their employee.

Denis testified that by the summer of 1967, he had begun to suspect the true nature of appellant's relationship with Holben. His mother Jeannine never indicated to him whether she shared his suspicions.

Holben further testified that in January 1968, she received a phone call from appellant. He said that Jeannine was flying to Canada to care for her sick mother. At appellant's request, Holben came to the house, had dinner, and stayed with the children. Appellant and Jeannine left the house with Jeannine's luggage. Appellant did not return until the next afternoon. Denis testified that appellant was carrying Jeannine's suitcases when he returned.

One or two days after Jeannine left, Holben and appellant moved into a new apartment in the Houston area, where they and the children all lived together for two to three weeks; they then moved together into a nearby house. Whenever Denis asked where his mother was, appellant maintained that Jeannine had flown back to Canada to take care of her mother. For the next several months, whenever the children asked him when Jeannine would return, appellant replied that it would be another two weeks.

Holben testified that about three weeks to a month after they moved from the apartment to the house, she and appellant watched a television news report that a human body had been discovered on February 11, 1968 near the Harris County line. Appellant spontaneously said, "They found her." Holben asked, "Found who?" Appellant replied, "Jeannine." Holben responded, "I thought she was in Canada." Appellant said, "She didn't go to Canada. She is there." He added, "If you say anything about this you

will end up where she is." When Holben asked why he did it, he replied that Jeannine had been going to die of cancer anyway. At some point thereafter, Holben told Anne–Marie that Jeannine would not be coming back. Anne–Marie testified that she related this information to her brother. Denis testified that when he confronted appellant about the matter, appellant raised his hand as if to slap his son and said, "Shut your f****** mouth and don't bug me with that again. She is not coming back. She doesn't love you and from now on I want you to call Pat mom."

Appellant and Holben lived together for some years and moved with the children to a number of times to different locations in the United States and Canada. Over the years, appellant gave various explanations about Jeannine's continued absence. Anne–Marie testified that on one occasion, he told her that Jeannine had pushed her in front of a moving car, and that, as a result, Jeannine had been confined to a mental institution and then put in jail. Appellant's uncle, Robert Durand, testified that appellant had also told a similar story to him. Anne–Marie also testified that on various occasions, appellant told her that Jeannine had died of cancer, that she had "just left," and that he had divorced her in Canada. Jeannine's brother Reginald Boissoneault testified that when he asked about her in 1971, appellant told him she was living in Vancouver and provided an address and telephone numbers for her that proved to be fictitious.

Other suspicious information gradually emerged. Robert Durand testified that in 1970, appellant asked him an odd series of questions concerning how long it takes for a corpse to decompose, how a corpse can be identified, and how and for how long a corpse can be preserved. Appellant knew that Robert had previously worked in a mortuary. Anne–Marie testified that several years after she had last seen her mother, she overheard appellant call Jeannine's mother in Quebec and tell her, falsely, that he, Jeannine, and the children were not far away and would be dropping by for a visit. She also testified that as early as 1972, Denis had begun to voice his suspicions to her that appellant had

murdered Jeannine. Denis testified that at another point, he contacted Jeannine's mother and surreptitiously traveled to Hull to see her. When appellant learned of the visit, he reacted with anger; he told Denis not to go there ever again, that they were "bad people."

Based on this evidence, the trier of fact could rationally conclude that Jeannine learned of appellant's adulterous relationship with Holben by late 1967 or early 1968; that she decided to leave him; that she confronted him about his infidelity; and that instead of taking her to the airport, appellant killed her and concealed her body in an isolated, wooded area. We conclude that the evidence is sufficient for a rational trier of fact to find, beyond a reasonable doubt, that appellant caused Jeannine's death.

We overrule point of error four.

In points of error three and five, appellant asserts that the trial court committed reversible error in denying his motion to suppress the testimony of Pat Holben concerning appellant's remarks following the television news report of the discovery of a decomposed body.

The determination of admissibility is within the sound discretion of the trial court. *Jackson v. State,* 575 S.W.2d 567, 570 (Tex. Crim.App.1979). Its ruling will not be reversed on appeal unless a clear abuse of discretion is shown. *Werner v. State,* 711 S.W.2d 639, 643 (Tex.Crim.App.1986); *Nubine v. State,* 721 S.W.2d 430, 432 (Tex. App.—Houston [1st Dist.] 1986, pet. ref'd). Moreover, the erroneous admission of evidence is reversible error only if there is a reasonable possibility that the evidence complained of might have contributed to the conviction or punishment. *Alexander v. State,* 740 S.W.2d 749, 765 (Tex.Crim.App. 1987); *Canto–Deport v. State,* 751 S.W.2d 698, 700 (Tex.App.—Houston [1st Dist.] 1988, pet. ref'd); Tex.R.App.P. 81(b)(2). Error is harmless if an average juror would not have found the State's case significantly less persuasive had the error not been committed. *Schneble v. Florida,* 405 U.S. 427, 432, 92 S.Ct. 1056, 1060, 31 L.Ed.2d 340 (1972); *Ex parte Duffy,* 607 S.W.2d 507, 524 (Tex.Crim. App.1980).

In point of error three, appellant asserts that the denial of his motion to suppress was error because he established that a valid common-law marriage existed between himself and Holben at the time of the conversation in question. Accordingly, he argues, the conversation fell within the marital communication privilege set forth in TEX.R.CRIM. EVID. 504(1).

The elements of a common-law marriage in Texas are (1) an agreement to be husband and wife; (2) living together as husband and wife; and (3) a holding out to the public that the couple are husband and wife. *Tompkins v. State,* 774 S.W.2d 195, 208 (Tex. Crim.App.1987); *Archie v. State,* 511 S.W.2d 942, 944–45 (Tex.Crim.App.1974); *Bell v. State,* 137 Tex.Crim. 401, 129 S.W.2d 664, 666 (App.1939). The existence of a common-law marriage is a fact question. *Hightower v. State,* 629 S.W.2d 920, 924 (Tex.Crim.App. [Panel Op.] 1981). The burden of proof is on the one seeking to establish the existence of such a marriage. *Richardson v. State,* 744 S.W.2d 65, 73 (Tex.Crim.App.1987), *vacated,* —— U.S. ——, 113 S.Ct. 3026, 125 L.Ed.2d 715 (1993); *Quinonez–Saa v. State,* 860 S.W.2d 704, 710 (Tex.App.—Houston [1st Dist.] 1993, pet. ref'd). In suppression hearings, the trial judge is the sole factfinder. *Green v. State,* 615 S.W.2d 700, 707 (Tex. Crim.App. [Panel Op.] 1980), *cert. denied,* 454 U.S. 952, 102 S.Ct. 490, 70 L.Ed.2d 258 (1981). In that capacity, the judge may believe or disbelieve all or any part of any witness's testimony. *Meek v. State,* 790 S.W.2d 618, 620 (Tex.Crim.App.1990). On appeal, we view the evidence in the light most favorable to the trial court's ruling. *Ortega v. State,* 861 S.W.2d 91, 92 (Tex. App.—Houston [1st Dist.] 1993, pet. ref'd).

We are persuaded that the trial court did not err in finding that appellant and Holben had not agreed to be husband and wife at the time of the critical conversation. There is no testimony that before this conversation, appellant had told Holben either that he had divorced Jeannine or that Jeannine was dead. The only reasonable inference from the evidence is that until this conversation, Holben believed that Jeannine was in Canada. Holben could not have agreed to enter into a common law marriage with appellant if she believed that appellant was still married to Jeannine.

Further, Holben's testimony that would tend to establish a common-law marriage was often ambiguous and uncertain. When asked by the prosecutor, "[A]t the time you were in the house and you testified about the newscast and the statements the defendant made, at that time did you ever present yourselves to be husband and wife?" Holben responded, "Not there, no." Much of her testimony relates only to the existence of a common-law marriage between her and appellant later than the day of the newscast. Holben testified that (a) within one or two days of the day Jeannine left for the airport, she and appellant moved into a new apartment in the Houston area, which they and the children occupied as a family of six, with herself and appellant sleeping together and holding themselves out as husband and wife; (b) she and appellant held themselves out as husband and wife when they lived in San Diego, and even had a party they billed as their twenty-fifth wedding anniversary while they lived in California; (c) she and appellant filed declarations of homestead as husband and wife in California in 1976; (d) although she and appellant had no real plans to become husband and wife when they first moved to the Houston area, she anticipated that appellant was going to divorce or separate from his wife and that the two of them would then be married. She avoided a direct answer when the defense counsel began to focus on the period of time relevant to appellant's motion to suppress:

Q: Prior to the time you moved into the house you considered yourself married to Raymond, didn't you?

A: Not really.

Q: Well, you were—this is at the time you were in the apartment and you're sleeping together; correct?

A: Yes.

Q: All right. You're telling people you are married; correct?

A: Yes.

Q: You thought—you mean you considered yourself married to him, didn't you?

A: I suppose you would say that.

In ruling on the motion to suppress, the trial court was required to resolve these contradictions and ambiguities and to assess Holben's credibility. The trial court could have concluded that, at the relevant time, although appellant and Holben may have been living together as husband and wife and holding themselves out as husband and wife by telling others that they were, they nevertheless had not agreed to *be* husband and wife. Alternatively, the trial judge could have concluded that appellant and Holben did not hold themselves out as husband and wife until later, when they were living in California.

We overrule point of error three.

■ In point of error five, appellant levels his second independent attack on the denial of his motion to suppress, asserting that this ruling was error because (a) under the law in effect at and after the time of Jeannine's death,[2] Pat Holben was an accessory to Jeannine's murder after the fact and was therefore an accomplice to the crime; (b) under TEX.CODE CRIM.PROC.ANN. art. 38.14 (Vernon 1979), a conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending not just to show that an offense was committed, but tending to connect the defendant with that offense; and (c) Holben's testimony was not properly corroborated. The State concedes the first two of these premises and argues that Holben's testimony was sufficiently corroborated to meet the requirement of article 38.14.

■ To test the sufficiency of corroboration under article 38.14, we must first eliminate the evidence of the accomplice witness from consideration. We then must examine the evidence of other witnesses to ascertain whether there is evidence of an incriminating nature that tends to connect the defendant

with the commission of the offense. If there is such evidence, the corroboration is sufficient; otherwise, it is not. *Edwards v. State*, 427 S.W.2d 629, 632 (Tex.Crim.App.1968). The corroborative evidence may be circumstantial or direct. It need not directly link the accused to the crime, nor must it be sufficient in itself to establish guilt. Corroborative evidence suffices if it tends to connect the accused with the crime. *Paulus v. State*, 633 S.W.2d 827, 843, 844 (Tex.Crim. App.1981).

Denis and Robert Durand both testified that appellant was engaged in an affair with Patricia Holben before Jeannine's disappearance. Denis and Anne–Marie both placed appellant in their mother Jeannine's presence shortly before she disappeared. Denis testified that appellant later returned without their mother but with her luggage in hand. The testimony of other witnesses, apart from Holben, showed additional suspicious circumstances: the varying, inconsistent explanations appellant later gave about Jeannine's continued absence; the false address and telephone numbers he gave for her; his odd questions about corpses; and his call to Jeannine's mother in which he told her, falsely, that Jeannine was with him, and that they were nearby and on their way to visit.

Considering all of these circumstances, we are convinced that there was incriminating evidence apart from Holben's testimony that tended to connect appellant with Jeannine's murder. In applying the test of the sufficiency of the corroboration, all the circumstances in evidence may be looked to for the necessary corroboration; and each case necessarily turns on its own facts. *Reed v. State*, 744 S.W.2d 112, 126 (Tex.Crim.App. 1988). We find that Holben's testimony was sufficiently corroborated.

We overrule point of error five.

In points of error six and seven, appellant contends that the trial court abused its discretion in denying his motion for new trial based on newly discovered evidence.

---

2. Former article 77 of the Penal Code read, in part, "An accessory is one who, knowing that an offense has been committed, conceals the offender, or gives him any other aid in order that he

may evade an arrest or trial or the execution of his sentence." TEX.PENAL CODE art. 77 (1925) (repealed 1973).

■ Motions for new trial on grounds of newly discovered evidence are not favored by the courts and are viewed with great caution. *Drew v. State,* 743 S.W.2d 207, 225 (Tex.Crim.App.1987); *Pinkston v. State,* 744 S.W.2d 329, 335 (Tex.App.—Houston [1st Dist.] 1988, no pet.). To obtain a new trial, the appellant must establish that: (1) the evidence was unknown to him at the time of his trial; (2) his failure to discover the evidence was not due to his want of diligence; (3) the materiality of the evidence is such that it would probably bring about a different result in another trial; and (4) the evidence is admissible, and *not merely cumulative, corroborative, collateral, or impeaching.* *Drew,* 743 S.W.2d at 226; *Keller v. State,* 854 S.W.2d 224, 227 (Tex.App.—Beaumont 1993, pet. ref'd); *Tate v. State,* 834 S.W.2d 566, 570 (Tex.App.—Houston [1st Dist.] 1992, pet. ref'd).

■ The new evidence giving rise to appellant's motion for new trial was a letter of agreement, dated April 23, 1992, between Denis and Anne–Marie and a Canadian literary agency for the rights to publish their "life story," and, in particular, the story of their mother's disappearance and appellant's trial for her murder. The agreement provides that,

> In exchange for these rights, [Denis and Anne–Marie] will receive 30% each and the writer 40% of all income derived from these rights, with the exception that the first $30,000 of income from book-publishing and film rights will go to the writer in order to facilitate the preparation of the book manuscript. Income from personal appearances and interviews, if any, will belong to the participant(s) exclusively, less a 15% agency commission. No appearances or interviews shall be arranged except through this agency.

In its brief, the State concedes that the appellant and his counsel did not know about the agreement when the trial of this case began on August 18, 1992. The State does not argue that appellant's failure to discover the agreement before trial was due to a want of diligence on his part.

Appellant contends that the agreement would clearly show that Anne–Marie and Denis each had a bias and motive to testify falsely or misleadingly to produce a particular result attractive to the entertainment industry. He contends that "[w]hile this evidence is impeaching, it is not *merely* impeaching, [because] ... it is 'of such weight as likely to bring about a different result' if presented to a jury," citing *Jones v. State,* 711 S.W.2d 35 (Tex.Crim.App.1986). Appellant reasons that if evidence is of such weight that it is likely to bring about a different result in another trial, then it necessarily follows that the evidence is not *merely* impeaching. We disagree.

In *Jones,* the Court of Criminal Appeals recognized a relationship between the third and fourth of the requirements for a new trial, saying, "Although exceptions may be found, as a rule, new evidence which is *merely* cumulative, corroborative, collateral or impeaching will rarely be judged by trial or appellate courts to be of such weight as likely to bring about a different result." *Jones,* 711 S.W.2d at 37. In a footnote, the *Jones* court gave two examples which make clear that the third and fourth requirements must be met independently. First, it recognized that testimony from a newly discovered disinterested witness may be cumulative of testimony of an interested defense witness without being *merely* cumulative, and may warrant a new trial. 711 S.W.2d at 37 n. 5. Second, it observed that "[t]estimony that not only impeaches, but also shows a witness to have been mistaken upon a material matter in the case will, if credible and newly discovered in spite of due diligence, call for the granting of a motion for new trial." *Id.*

Appellant has pointed to no value of the agreement other than as an impeachment tool with which to cross-examine Anne–Marie and Denis. Because this evidence is merely impeaching, the trial court did not abuse its discretion in overruling appellant's motion for new trial.

We overrule points of error six and seven.

■ In point of error eight, appellant asserts that the trial court committed reversible error in overruling his objection to the jury charge on parole law.

This case was tried in August 1992, before the 1993 amendment [3] adding murder to the offenses listed in section 3g(a)(1) of article 42.12 of the Code of Criminal Procedure. At that time, the parole law instruction required in a murder case was that set forth in section 4(b) of article 37.07 of the Code of Criminal Procedure:

Under the law applicable in this case, the defendant, if sentenced to a term of imprisonment, may earn time off the period of incarceration imposed through the award of good conduct time. Prison authorities may award good conduct time to a prisoner who exhibits good behavior, diligence in carrying out prison work assignments, and attempts at rehabilitation. If a prisoner engages in misconduct, prison authorities may also take away all or part of any good conduct time earned by the prisoner.

It is also possible that the length of time for which the defendant will be imprisoned might be reduced by the award of parole.

Under the law applicable in this case, if the defendant is sentenced to a term of imprisonment, he will not become eligible for parole until the actual time served plus any good conduct time earned equals one-fourth of the sentence imposed or 15 years, whichever is less. Eligibility for parole does not guarantee that parole will be granted.

It cannot be accurately predicted how the parole law and good conduct time might be applied to this defendant if he is sentenced to a term of imprisonment, because the application of these laws will depend on decisions made by prison and parole authorities.

You may consider the existence of parole law and good conduct time. However, you are not to consider the extent to which good conduct time may be awarded to or forfeited by this particular defendant. You are not to consider the manner in which the parole law may be applied to this particular defendant.

Act of May 6, 1987, 70th Leg., R.S., ch. 66, sec. 1, 1987 Tex.Gen.Laws 170, 171 (also presently set forth in TEX.CODE CRIM.PROC. ANN. art. 37.07, § 4(b) (Vernon Supp.1994)). In this case, the trial court omitted the third paragraph of the required charge in its instructions to the jury.

Appellant did not preserve this error by proper objection. He objected that the parole law charge "as given does not correctly . . . apply the law to the facts as it is applicable to this case" and "does not apply to the law of the facts of this case on the parole charge." This language did not specify that the instruction given was not the full and complete statutory instruction; rather, it objected that the charge did not properly apply the law to the facts. Because appellant did not adequately apprise the trial court that he objected to the omission of a paragraph of the statutory instruction, he waived this error.

We overrule point of error eight.

■ In point of error nine, appellant asserts that the trial court committed reversible error in refusing to submit the following instruction to the jury:

You are further instructed that the State must prove three additional elements beyond a reasonable doubt. First, you must find beyond a reasonable doubt that the body of Jeannine Durand was found and identified. Second, you must also find beyond a reasonable doubt that the death of Jeannine Durand was caused by the criminal act of another. Third, you must also find beyond a reasonable doubt that the Defendant, Raymond Durand, is the guilty agent connected with the criminal act.

This instruction was based on former article 1204 of the Penal Code, which required the finding and identification of a body as a prerequisite to a homicide conviction.

Even before the passage of the 1925 Penal Code, the Court of Criminal Appeals refused to require that the language of the statute be included in the jury charge. In *Southern v. State*, 60 Tex.Crim. 578, 132 S.W. 778 (App.

3. Act of June 19, 1993, 73rd leg., R.S., ch. 900, sec. 4.01, 1993 Vernon's Texas Session Law Service 3589, 3721. The version of section 3g(a)(1) of article 42.12 amended by that act was: Act of June 15, 1991, 72nd Leg., R.S., ch. 541, sec. 1, 1991 Tex.Gen.Laws 1876, 1876.

1910), the court held that giving a separate jury instruction embodying the substance of that statutory language was not required, writing that the statute instead set forth "a rule of evidence and limitation upon the quantum of proof required in the case to which it relates." *Id.* at 779.[4]

We overrule point of error nine.

We affirm the judgment of the trial court.

---

**4.** The *Southern* court also observed that the matters in question were adequately addressed by the instruction that the jury could convict Southern only if they believed beyond a reasonable doubt that the alleged victim was dead and that Southern had killed him. *Id.* Here, the jury was similarly instructed:

> Now if you find from the evidence beyond a *reasonable doubt that in Harris County, Texas,* the defendant, Raymond Durand, on or about the 11th day of February 1968, did unlawfully and voluntarily with malice aforethought, kill Jeannine Paulette Durand, by causing blunt trauma to the head of Jeannine Paulette Durand, ... then you will find the defendant guilty ... [.] Unless you so find from the evidence beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will acquit the defendant and say by your verdict "Not Guilty."