BROWN V. STATE

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-03-289-CR

JEFFERY MICHAEL BROWN APPELLANT

V.

THE STATE OF TEXAS STATE

------------

FROM COUNTY CRIMINAL COURT NO. 2 OF DENTON COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------

Appellant Jeffery Michael Brown was convicted by a jury for the offense of deadly conduct.  Thereafter, Appellant reached a plea bargain agreement with regard to sentencing.  The trial court accepted the agreement and accordingly sentenced Appellant to 300 days’ confinement in the county jail, suspended for twenty-two months, and a $1,000 fine.  In two points, Appellant challenges the legal sufficiency of the evidence and the trial court’s denial of his motion for new trial.  We will affirm.

I.  Factual and Procedural Background

Appellant was charged by information with the misdemeanor offense of deadly conduct for pointing a firearm at or in the direction of Chad Kingston.  
See
 
Tex. Penal Code Ann
. § 22.05 (Vernon 2003).  Appellant pleaded not guilty, and the case went to trial.  During trial, the State called Kingston, Detective Benny Parkey, and Officer Allen Zant, and the State offered into evidence a written statement Appellant made to the police.  Appellant testified on his own behalf. 

Kingston testified that, on August 20, 2002, he was driving to his parents’ house around 10:45 p.m. when he noticed a pair of headlights behind him and the driver speed up.  Kingston said that the vehicle, a pickup truck, was following “a little too close[ly],” so he sped up.  The truck stayed directly behind Kingston at a distance of five or six feet “at the most.”  Kingston testified that he approached a red light and was about to make a left turn and that the truck “[l]ocked up his brakes and slid into the intersection,” presumably because “he just missed the turn.”  Kingston stated that he was nervous because the truck was driving so close and so fast, and he decided to turn on a road leading to a Wal-Mart parking lot.  Kingston testified that the truck followed him into the Wal-Mart parking lot. 

Kingston testified that Appellant’s truck “struck the rear end of [his] car,” leaving a “little ding” and white paint from the truck on his fender.  Kingston said that he stopped his car and put it in park to exchange insurance information, at which time the driver of the pickup truck got out of his truck, took a stance, raised his arms, and told him to “freeze.”  Kingston demonstrated for the jury the stance Appellant took, showing that his feet were apart and his hands were up.  Kingston stated that he never got out of his car.

Kingston testified that, at first, he could not see what Appellant was holding, stating that he “saw the light glean off of something [and] his hands straight out in front of him [with] something in his hands.”  Kingston was unsure of what Appellant was holding, thinking “it was a stun gun or something,” but then he “thought it was a gun [by] the way he was standing and . . . telling me to freeze and everything.”  When asked how Appellant’s actions made him feel, Kingston testified that “[i]t scared me.” 

Instead of getting out of his car, Kingston testified that he drove home to his parents’ house because he did not have a cell phone and did not know what to do.  Kingston testified that Appellant followed him home and stopped in front of the house as he pulled into the driveway.  Both Kingston and Appellant got out of their vehicles.  Kingston stated, “I was mad, and I went out in the road yelling to him.”  As he approached Appellant, Kingston saw Appellant “[s]tanding there with his hand on his gun.”  Kingston again demonstrated for the jury how Appellant was standing, showing the jury that Appellant’s gun was on his left side and that Appellant’s hand was down at the time.  According to Kingston, he did not give Appellant a chance to say anything, telling him that he was going to call the police, at which point Appellant responded, “good, go ahead.”  Kingston knocked on his parents’ door because he did not have his key and asked his mother to call the police.  Appellant left before the police arrived.  Kingston testified that he was “glad he was gone” because he “didn’t know what [Appellant] was going to do [and because he] didn’t want to put [his] family in danger if [Appellant] was going to do something.” 

The police arrived about an hour later, and Kingston gave a description of the truck and its driver to the police.  Kingston told the police that the name “Accu-Guard Security” was painted on the truck.  Kingston identified Appellant in court as the driver of the truck.  Kingston also testified that he told the police what the defendant pointed at him.  Kingston stated, “It was a shiny metal and black, and I didn’t know it was a revolver until it was in front of my mom’s house.”  When asked whether that was the same object Appellant pointed at him in the Wal-Mart parking lot, Kingston said, “That’s where his hand came from when he got out of his truck.” 

On cross-examination, Kingston acknowledged that he did not observe the firearm in the Wal-Mart parking lot because it was dark and instead thought it was a stun gun.  However, Kingston testified that he was scared and knew that Appellant was pointing something at him.  Kingston testified that, because the only object he saw on Appellant’s left side while in front of his parents’ house was a gun, which was the same place Appellant had his hand in the parking lot, he later realized that Appellant had pointed a handgun at him in the Wal-Mart parking lot. 

Officer Zant testified that he was dispatched to Kingston’s home on August 20, 2002.  Officer Zant testified that he spoke with Kingston and filed a report based on the account Kingston gave him.  While Officer Zant testified that the damage on Kingston’s car appeared to have “been delivered by a white vehicle” consistent with a pickup truck, he acknowledged that he did not observe the collision, did not inspect Appellant’s truck or the Wal-Mart parking lot, and based his report on the damage he observed on Kingston’s car and what Kingston told him. 

Detective Parkey testified that he investigated this case and located Appellant by contacting the company Accu-Guard, which employed Appellant and had a vehicle fitting the description Kingston gave Detective Parkey.  Detective Parkey contacted Appellant and met with him at the police department.  After being read his 
Miranda
 rights, Appellant gave Detective Parkey the following signed, written statement:

Last night I was driving home to my home on Mills Road in Denton.  I was driving north on Mayhill from I-35.  When I got to the Pecan Creek on Mayhill a car pulled out in front of me.  The car was a maroon car.  I was doing about 35 miles an hour and the car that pulled in front of me was doing about 15 miles an hour and I tried to pass him.  The car then got into the center of the road and would not let me pass.  The car then sped up to about 80 or 90 miles an hour and I followed him to the light at Spencer road.  He had to lock up his brakes to stop and make the turn onto Spencer.  I was able to swing my truck around to get down Spencer.  The car then followed me and I tried to get to the Wal Mart parking lot.  I turned into the Wal Mart parking got [sic] and I parked under the nearest light I could find.  The car then pulled into the parking lot and he was behind me.  The car came around me and bumped my truck with his left rear fender to my right front fender.  When he hit me I was trying to get out of the truck.  I got out of the truck.  I was afraid that he was going to do something to me so I pulled my service weapon, which is a Ruger 9mm pistol.  The pistol is two tone with a silver slide and a black frame.  I held the weapon down to my knees and I saw the other driver and he had a look of hatred on his face.  I was in fear of my safety.  The driver then pulled around to where I was standing and I could see that he was not going to stop so I pointed my weapon at him and ordered him to stop.  The driver then continued to drive away.  I tried yelling at him to make him stop and telling him that he hit me.  The car then drove away.  I went back to my truck and I followed him to a house.  The car parked in a driveway and I parked in the middle of the road.  The guy driving the car walked into the middle of the road to confront me.  I asked him what the hell his issue was.  He asked why I was trying to pass him in a no passing zone.  He then told [sic] he did not care about my gun.  He told me that I had hit him and I told him that he had hit me.  He then said the [sic] he was going to call the police.  I was afraid that he might have a weapon or friends so I left the area and went home.  I did not think anything of it so I did not call the police. 

Detective Parkey testified that Appellant told him that he had pulled his weapon and pointed it at Kingston in the parking lot. 

After calling Detective Parkey, the State rested.  Appellant moved for an instructed verdict on the basis that the State had failed to proved the elements of deadly conduct.  The trial court overruled Appellant’s request, and Appellant took the stand. 

When Appellant took the witness stand, he gave a different version of the events occurring on August 20, 2002 and characterized his action in pulling his gun as one of self-defense.  Appellant testified that he is a security officer but not a police officer.
(footnote: 2)  He testified that he was traveling down Mayhill Road about thirty-five miles per hour when a maroon car pulled out in front of him when he was around five or six feet away from the car.  As a result, Appellant said that he “had to stop very quickly.”  Appellant testified that the maroon car drove ten or fifteen miles per hour in front of him, so he tried to pass him.  Appellant said that the maroon car then straddled the center line to prevent him from passing.  Appellant said he only passed him when they got to an intersection down the road where the maroon car “lock[ed] his brakes up.”  Appellant testified that he turned at Spencer Road and then, “ten or fifteen seconds later,” he saw the maroon car coming up behind him at “a very high rate of speed.”  

Appellant said he did “what [he] was trained to do”—go to Wal-Mart, where there are lots of people, lights, and cameras.  Appellant said he parked his truck in Wal-Mart’s big lot and got out of his truck.  Appellant was dressed in his uniform, and he had his firearm.  Appellant testified that the maroon car came behind him, came around him on the right, and struck his truck’s front fender with its back fender.  According to Appellant, the maroon car did a U-turn and came toward him, and he became fearful that he was going to be hit.  Appellant admitted that he drew his semiautomatic gun, a .9 millimeter Ruger P-90, on the maroon car but did not shoot it. 

Appellant further testified that he followed Kingston to a house to get information to file a claim for damage to his truck.  Appellant stated that, when both vehicles arrived at the house, Kingston “is charging me,” so he put his hand on his weapon.  According to Appellant, the two men “had a verbal confrontation” before Kingston told him that he was going to call the police.  Appellant stated that he left and went home. 

On cross-examination, Appellant agreed that it was too dark in the parking lot to see the maroon car’s license plate but not too dark to prevent him from seeing the hatred on the driver’s face.  Appellant agreed that he was prepared to shoot Kingston that night “[i]f I had to.”  Appellant testified on redirect that he drew his weapon in self-defense and stated, “I believe that after I drew the weapon is what made him change his mind about whatever his intentions were.” 

After hearing and considering all of the evidence and testimony presented, the jury found Appellant guilty of deadly conduct.

II.  Legal Sufficiency

In his first point, Appellant asserts that the trial court erred in overruling his motion for instructed verdict based on insufficiency of the evidence.  A challenge to the denial of a motion for an instructed verdict is actually a challenge to the legal sufficiency of the evidence.  
See Madden v. State
, 799 S.W.2d 683, 686 (Tex. Crim. App. 1990), 
cert. denied
, 499 U.S. 954 (1991); 
Jackson v. State
, 50 S.W.3d 579, 597 (Tex. App.—Fort Worth 2001, pet. ref’d).

In reviewing the legal sufficiency of the evidence to support a conviction, we view all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  
Jackson v. Virginia
, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); 
Burden v. State
, 55 S.W.3d 608, 612 (Tex. Crim. App. 2001).  This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.  
Jackson
, 443 U.S. at 319, 99 S. Ct. at 2789.  When performing a legal sufficiency review, we may not sit as a thirteenth juror, re-evaluating the weight and credibility of the evidence and, thus, substituting our judgment for that of the fact finder.  
Dewberry v. State
, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999), 
cert. denied
, 529 U.S. 1131 (2000).

“A person commits an offense if he recklessly engages in conduct that places another in imminent danger of serious bodily injury.”  
Tex. Penal Code Ann
. § 22.05(a).   Further, “[r]ecklessness and danger are presumed if the actor knowingly pointed a firearm at or in the direction of another whether or not the actor believed the firearm to be loaded.”  
Id
. § 22.05(c).  Here, Appellant argues that the evidence was legally insufficient to establish that Kingston was placed in imminent danger of serious bodily injury because the victim stated that he did not realize that Appellant had a gun until after the incident occurred.  We disagree.

While it is true that Kingston did not know conclusively until after Appellant had pointed his handgun at him that Appellant was in fact pointing a handgun at him in the parking lot, he testified that Appellant took a stance, raised his arms, pointed something at him, and told him to freeze.  Kingston testified that, because it was dark, he thought Appellant was holding a stun gun and only later realized that he had been holding an actual firearm.  Appellant admitted before and during trial that he had held and pointed a semiautomatic handgun at Kingston’s car while in the parking lot of Wal-Mart.

In 
Bell v. State
, the court of criminal appeals stated the following in regard to the State’s burden of proof on the offense of deadly conduct:

Patently, threatening another with imminent bodily injury is engaging in conduct.  When that threat is accomplished by the use of a deadly weapon, by definition the victim is “exposed” to the deadly character of the weapon and the inherent risk of serious bodily injury.  The 
danger 
of serious bodily injury is necessarily established when a deadly weapon is 
used 
in the commission of an offense.  It follows, therefore, that proof of threatening another with imminent bodily injury by the use of a deadly weapon constitutes proof of engaging in conduct that places another in imminent danger of serious bodily injury.

693 S.W.2d 434, 438-39 (Tex. Crim. App. 1985).  
Bell
 also offers that “danger“ as used in the deadly conduct statute means “exposure or liability to injury, pain, or loss” and “jeopardy; exposure to loss or injury; peril.”  
Id
. at 438 (quoting dictionary definitions).  Neither definition of “danger” refers to the victim’s perception.  
See id
.  Further, the Fourteenth District Court of Appeals in Houston has stated that deadly conduct is not a result-oriented offense because it does not prescribe a specific result; rather, it requires only that the actor engage in the proscribed conduct.  
Ford v. State
, 38 S.W.3d 836, 845 (Tex. App.—Houston [14
th
 Dist.] 2001, pet. ref’d).

In this case, the State sought to prove that Appellant recklessly placed Kingston in imminent danger of serious bodily injury by pointing a semiautomatic firearm at or in the direction of Kingston.  
See 
Tex. Penal Code Ann
. § 22.05(a), (c).
  Under the statute, the State had to prove only that Appellant recklessly engaged in conduct that placed Kingston in imminent danger of serious bodily injury.  
See id
. § 22.05(a).  The State, however, was not required to prove that Kingston knew that a firearm was pointed at him.

Based on our review of the evidence, under the applicable standard of review, giving due deference to the fact finder’s determinations, we conclude that the evidence presented at trial is legally sufficient to support Appellant’s conviction for deadly conduct.  
See Jackson
, 443 U.S. at 319, 99 S. Ct. at 2789; 
Burden
, 55 S.W.3d at 612.  We further hold that the trial court did not err in denying Appellant’s motion for instructed verdict.  Appellant’s first point is overruled.

III.  Motion for New Trial

In his second point, Appellant contends that the trial court erroneously denied him a fair trial by overruling his motion for new trial.  During trial, the State questioned Kingston about three prior convictions he had that the trial court determined were admissible under Texas Rule of Evidence 609.  
Tex. R. Evid
. 609.  In his motion for new trial, Appellant asserted that much of the testimony about Kingston’s three prior convictions was false.  On appeal, Appellant claims that he is entitled to a new trial because the State’s main witness made material and false misrepresentations as to his own prior convictions, which undermine his credibility. 

A trial court has discretion to decide whether to grant a new trial based upon newly discovered evidence, and its ruling will not be reversed absent an abuse of discretion.  
Keeter v. State
, 74 S.W.3d 31, 37 (Tex. Crim. App. 2002).  The Texas Code of Criminal Procedure provides that a new trial shall be given to an accused where material evidence favorable to the accused has been discovered since trial. 
Tex. Code Crim. Proc. Ann
. art. 40.001 (Vernon Supp. 2004-05); 
Keeter
, 74 S.W.3d at 36.  Motions for new trial based on newly discovered evidence are not favored by courts and are viewed with great caution.  
Drew v. State
, 743 S.W.2d 207, 225 (Tex. Crim. App. 1987); 
Thomas v. State
, 31 S.W.3d 422, 428 (Tex. App.—Fort Worth 2000, pet. ref’d).  To establish an abuse of discretion, the appellant must show that (1) the evidence was unknown to him before trial; (2) his failure to discover the evidence was not due to his want of diligence; (3) it is probably true, and its materiality will probably bring about a different result upon a new trial; and (4) it is competent, not merely cumulative, corroborative, collateral, or impeaching.  
Wallace v. State
, 106 S.W.3d 103, 107-08 (Tex. Crim. App. 2003); 
Keeter
, 74 S.W.3d at 36-37.

The claimed newly discovered evidence presented in Appellant’s motion for new trial is embodied in five documents pertaining to Kingston’s three prior convictions.  Appellant points out that, during trial, Kingston stated that, when he was convicted of aggravated assault, he only pushed his girlfriend.  Attached to Appellant’s motion for new trial were an affidavit for an arrest warrant and an indictment of Kingston for aggravated assault of his girlfriend for choking and kicking her.  Additionally, Appellant directs us to Kingston’s testimony that, when he was convicted of failure to stop and give information, no fault was assigned to him.  Appellant contrasts that testimony with a probable cause affidavit, in which a peace officer swore that Appellant was found intoxicated and the complainant alleged that Kingston was at fault.
(footnote: 3)
 At the outset, we observe that all of the information included in Appellant’s motion for new trial appears to have been publicly available to and easily discoverable by Appellant prior to trial.  But more importantly, we agree with the State that all of this newly discovered evidence is “merely impeaching” and collateral to the issues at hand.  Appellant argues that the evidence was likely to bring about a different result if presented to the jury because it would have significantly hurt Kingston’s credibility at trial. 

From our reading of the record, neither Kingston nor Appellant agreed on exactly what occurred on the night of August 20, 2002.  Both men gave seemingly conflicting statements at times, and both men testified to having a prior criminal background.
(footnote: 4)  It is undisputed, however, that Appellant pointed a semiautomatic handgun at Kingston.  Nothing in the newly discovered evidence goes to the core issue of whether Appellant engaged in conduct that placed Kingston in imminent danger of serious bodily injury when he pointed his semiautomatic handgun at Kingston.

“There is a clear distinction between testimony which could only impeach a witness who had testified [at] the trial, and evidence showing that such witness was mistaken about a matter material to the [S]tate’s case.”  
Barrett v. State,
 98 Tex. Crim. 627, 267 S.W. 511, 513 (1924).  Further, we follow the Houston Court of Appeals, which has expressly rejected reasoning similar to Appellant’s.  
See Durand v. State,
 881 S.W.2d 569, 578 (Tex. App.—Houston [1
st
 Dist.] 1994), 
rev’d on other grounds, 
958 S.W.2d 395 (Tex. Crim. App. 1996).  Appellant’s only argument is that the newly discovered evidence diminishes the credibility of Kingston’s testimony, which is exactly the purpose of impeachment evidence.  The newly discovered evidence is, therefore, insufficient to warrant a new trial.  
See Blackmon v. State,
 926 S.W.2d 399, 403 (Tex. App.—Waco 1996, pet. ref’d) (holding that trial court did not abuse its discretion in denying defendant’s motion for new trial where newly discovered evidence was merely impeaching hearsay evidence).  Accordingly, we hold that the trial court did not abuse its discretion by denying Appellant’s motion for new trial.  
See id
.

Finally, to the extent Appellant complains that the trial court abused its discretion in failing to hold a hearing on his motion for new trial, we conclude such a complaint is without merit.  
See Wallace
, 106 S.W.3d at 108 (holding trial court abuses its discretion in failing to hold hearing on motion for new trial when motion for new trial and accompanying affidavit(s) “rais[e] matters not determinable from the record, upon which the accused could be entitled to relief”) (brackets in original).  In this case, the trial court did not abuse its discretion by not holding a hearing on Appellant’s motion for new trial because Appellant did not raise any matters to which he would have been entitled to relief.  
See id
.  Appellant’s second point is overruled.

IV.  Conclusion

Having overruled both of Appellant’s points, we affirm the trial court’s judgment.

ANNE GARDNER

JUSTICE

PANEL B: HOLMAN, GARDNER, and WALKER, JJ.

DO NOT PUBLISH

Tex. R. App. P.
 47.2(b)

DELIVERED: August 30, 2004

FOOTNOTES
1:
See 
Tex. R. App. P. 
47.4.

2:
When asked to explain the extent of his training with the operation of guns and the use of deadly force, Appellant told the jury that he is an Eagle Scout with the Boy Scouts of America, is certified by the Texas Commission on Private Security, and is a private investigator as a commissioned security officer. 

3:
At trial, Kingston also testified that he was convicted of sexual assault of a child under seventeen for having a sexual relationship with a sixteen-year-old female (with whom he had a child) when he was twenty-one years old.  Appellant attached the indictment from the sexual assault case and a document purporting to list Kingston’s victim’s date of birth, which showed that she was actually fifteen at the time Kingston had sexual relations with her.  While Appellant argued about this discrepancy in his motion for new trial, he does not raise this issue in his appellate brief. 

4:
Appellant admitted that he had previously pleaded guilty to theft between fifty and five hundred dollars.